# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JANETTE PURIFOY,               ) | |
|     Plaintiff,              ) | No. 13 C 6617 |
|                             ) | |
|     v.                      ) | Magistrate Judge Geraldine Soat Brown |
|                             ) | |
| CAROLYN W. COLVIN,              ) | |
| Acting Commissioner of Social Security, ) | |
|     Defendant.              ) | |
|                             ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Janette Purifoy brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act, 42 U.S.C. §§ 421, 423. (Compl.) [Dkt 1.][1] Plaintiff has moved for summary judgment [dkt 14] and filed a supporting memorandum (Pl.'s Mem.) [dkt 15]. The Commissioner has filed a cross-motion for summary judgment [dkt 19] along with a memorandum in support (Def.'s Mem.) [dkt 20]. Plaintiff has replied. (Pl.'s Reply.) [Dkt 21.] The parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c). [Dkt 10.] For the reasons set forth below, Plaintiff's motion is denied and the Commissioner's motion is granted.

---

[1] The regulations regarding DIB and SSI are substantially similar and where they do not significantly differ, only one section will be cited. *See Ashpaugh v. Apfel*, No. 98 C 6561, 2000 WL 1222153 at *1 n. 3 (N.D. Ill. Aug. 22, 2000).

1

**PROCEDURAL HISTORY**

Plaintiff first applied for benefits on May 5, 2009. (R. 293.) After the agency denied her claims initially and on reconsideration (R. 177-94), Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (R. 197-98). The hearing was held in November 2010. (R. 44-98.) On December 15, 2010, the ALJ issued a decision denying Plaintiff's request for benefits. (R. 139-52.) On February 12, 2012, finding shortcomings with the ALJ's decision, the Appeals Council remanded the case back to the ALJ. (R. 159-61.) After a second hearing in May 2012 (R. 101-34), the ALJ again denied Plaintiff's request for benefits on June 1, 2012 (R. 8-27). The Appeals Council declined Plaintiff's request for review (R. 1-3), so the ALJ's decision is the final decision of the Commissioner. *See Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).

**BACKGROUND**

Plaintiff applied for benefits at age 48. (R. 293.) In her application, she stated that she stopped work in April 2009 because of alleged disabilities that included diabetes, neuropathy, a uterine fibroid, and depression. (R. 349.) Notably, that statement is at odds with Plaintiff's testimony that she was let go because of attendance problems resulting from her wanting to spend more time with her grandchildren. (R. 52-53.) She had worked as a cashier, a packer at a food factory, and a dietary aide at a hospital. (R. 350, 404.) She attended school until tenth grade. (R. 353.)

**Medical Evidence**

According to Plaintiff, she was first diagnosed with diabetes in 1994, and her condition has

2

worsened since that time. (R. 51, 55.) Her primary treating physician was Dr. Chukwudozie Ezeokoli, a specialist in internal medicine, who treated her diabetes with insulin. (R. 108, 592, 642, 692.) Plaintiff says that Dr. Ezeokoli was her primary treating physician for diabetes from 2007 until at least May 2012, the time of her second hearing before the ALJ. (R. 108.) All of Dr. Ezeokoli's notes in the record, however, are from 2010 and 2011. (R. 592, 642, 692.)

According to Dr. Ezeokoli's notes, Plaintiff's diabetes was often not well controlled. (R. 592, 594.) This was partly because of Plaintiff's noncompliance with her prescribed treatments, which included taking insulin and metformin. (R. 592.)[2] The doctor observed on a number of occasions throughout 2010 that Plaintiff had not taken her medications, tested her blood sugar, attended appointments, or quit smoking six to ten cigarettes per day as recommended. (R. 592, 596, 598, 692.) In August 2010, Dr. Ezeokoli referred Plaintiff to a diabetes clinic for the fifth time but warned, "If she is not ready to comply with her medications then I cannot really help her and she will most likely end up dying prematurely from a [diabetes] complication." (R. 692.)

In March 2010, Dr. Ezeokoli completed a questionnaire describing Plaintiff's limitations from diabetes. (R. 639-42.) He concluded that Plaintiff could lift 20 pounds occasionally and ten pounds frequently, could stand or walk about four hours during an eight-hour workday, would need to take half-hour breaks every three to four hours, and was likely to miss about three days per month. (R. 640-42.) He observed that she had "[g]eneralized persistent anxiety" but did not say whether Plaintiff had any limitations because of that condition. (R. 643.) He indicated that she had

---

[2] Metformin is used to treat diabetes; it affects the body's insulin production but is not itself insulin. *See Dorland's Illustrated Medical Dictionary* 1146 (32d ed. 2012) [hereinafter *Dorland's*].

"hyper/hypoglycemic attacks" and elevated blood pressure and tachycardia. (R. 639.)[3] Asked to identify any medication side effects that "may have implications for working," Dr. Ezeokoli wrote that some side effects of using insulin are "hypoglycemic episodes with agitation, sweating, and altered mental state." (R. 639.)

Dr. Ezeokoli's questionnaire is the only assessment of Plaintiff's limitations in the record by a treating physician. Although the questionnaire mentions Plaintiff's anxiety, the record does not contain evidence that she received professional psychiatric treatment for any mental disabilities.[4] In regard to her application for disability benefits, however, additional physicians completed assessments of Plaintiff's limitations caused by both her diabetes and depression.

The earliest of the additional assessments is from September 2009, when Dr. Donna Hudspeth and Dr. Charles Kenney reviewed Plaintiff's medical records. (R. 549-70.) Dr. Hudspeth, a psychologist, concluded that Plaintiff's depression did not constitute a severe impairment because Plaintiff had only mild limitations in concentration, persistence, or pace and no extended episodes of decompensation. (R. 549, 559.) Dr. Hudspeth appears to have based her assessment on notes from "Dr. Rana," but those notes are not in the record. (R. 561.) Dr. Kenney focused on Plaintiff's physical ailments from her diabetes and uterine fibroid. (R. 563.) He concluded that she could lift 50 pounds occasionally and 25 pounds frequently, and could stand, walk, or sit for six hours in an eight-hour workday, with no limitations in movement. (R. 564.) He also opined that Plaintiff's

---

[3] Tachycardia is "excessive rapidity in the action of the heart." *Dorland's* at 1867.

[4] When the ALJ asked Plaintiff during her second hearing if she had seen a doctor about her depression, Plaintiff said that she "talked to someone, but . . . they wanted to further it and they're going to make another session for that." (R. 123.) It is not clear who that someone was or whether an additional session ever occurred.

statement about her activities of daily living were inconsistent with the physical findings. (R. 570.)
Dr. Kenney's opinion was affirmed later in 2009 by state-agency physician Dr. David Mack. (R. 575-77.)

In March 2011, Plaintiff went to the emergency room complaining of pain in her left arm. (R. 741.) She said that the pain had lasted five months and rated its intensity as ten out of ten. (*Id.*) A physical exam, however, revealed a normal range of motion in her upper extremities. (R. 743.)

Four months later, Dr. Peter Biale examined Plaintiff on behalf of the state agency. (R. 754-57.) He observed that she had some limitation in moving her left shoulder but had a "full range of motion noted in all other joints." (R. 756.) He also noted that she had "no difficulty" getting on and off the examination table or getting up from a chair, that she had a wide-based gait without the use of an assistive device, and that she had a normal range of motion in her back. (R. 755-56.) She did, however, lose balance when trying to squat and do a heel-and-toe walk and complained of dizziness when moving from sitting to lying down and getting back up. (*Id.*) Around the same time, x-rays of Plaintiff's left shoulder showed no abnormalities. (R. 759.) Relying on Dr. Biale's examination, another state-agency physician, Dr. Calixto Aquino, found that Plaintiff could lift 20 pounds occasionally and ten pounds frequently, and could sit, stand, or walk for six hours in an eight-hour workday. (R. 722.)

Agency doctors also reviewed Plaintiff's mental condition in 2011. First, Dr. Henry Fine performed a psychiatric evaluation of Plaintiff in July 2011. (R. 749-52.) He observed that her "[a]ttitude and degree of cooperation were good," but that, based on Plaintiff's description of her symptoms, she has "major depression with suicidality, auditory hallucinations and paranoid ideas of reference." (R. 749, 751.) He added that Plaintiff's "depression apparently started somewhat after

5

she stopped working" and is "currently not treated, but she's scheduled to be evaluated and begin treatment." (R. 751.) Reviewing Dr. Fine's evaluation, Dr. Joseph Cools then determined that Plaintiff had "moderate" limits in concentration, persistence, or pace, and had one or two extended episodes of decompensation. (R. 717.) He also concluded that Plaintiff was suffering from major depression "though the severity is questionable" because of her lack of treatment or medication and because she "allege[d] more limitations in functioning than are supported by the medical data." (R. 719.)

The assessments from Dr. Aquino and Dr. Cools were affirmed in November 2011 by two agency physicians, Dr. Bharati Jhaveri and Dr. Donald Cochran. (R. 703-05.) The reviewing doctors again noted Plaintiff was "poorly compliant with diabetes medication" and had "not sought or received any mental health treatment." (R. 705.) They concluded that Plaintiff's own account of her limitations was "not fully supported by the medical evidence." (*Id.*)

**Hearings**

Plaintiff's first hearing before the ALJ was held in November 2010. Plaintiff testified that she became unable to work in April 2009 because of her diabetes but also stated that her supervisors at her most recent position—a cashier at an airport gift shop—had not approved of her trying to get time off to spend time with her grandchildren, and that she had been let go because of attendance problems. (R. 50-53.) Plaintiff also described the effects of her diabetes as including tingling and aching in her fingers and blurry vision, for which she had obtained reading glasses but had not yet attended a scheduled appointment with an eye doctor. (R. 61-62.)

At the second hearing, in May 2012, Plaintiff again testified about her condition. (R. 107-

6

124.) She explained that she was experiencing tingling and numbness in her feet, toes, left arm, and fingers. (R. 109, 111.) She also said that she could not stand for more than an hour, could not type, had problems twisting things with her hands, and got dizzy for approximately ten minutes every other day. (R. 113, 119-22.) She complained of blurry vision but still had not seen an eye doctor. (R. 110.) She said that she had "no problem sitting," except that she would not want to sit too long because it may cause "problems with your buttocks." (R. 116.) As for daily activities, Plaintiff said that she mostly sits and watches television. (R. 115.) She could go outside in her yard but not much else because, she said, "if you don't have money, you can't do much or nothing." (*Id.*) She was living with her daughter, who did most of the housework and who did not work but received public aid. (R. 114.)

After Plaintiff testified, the ALJ asked a vocational expert ("VE") a series of questions about Plaintiff's potential employment. (R. 124-32.) One of those questions asked what jobs were available to a person who can lift up to 20 pounds occasionally and ten pounds frequently; stand, walk, or sit approximately four hours per eight-hour workday, with normal breaks and an option to sit or stand alternatively at will provided she is not off task more than 10% of the work period; and must work at a low-stress job involving simple, routine, and repetitive tasks. (R. 125-29.) The VE stated that such a person could not perform Plaintiff's past work because those positions did not involve repetitive tasks, but that the person could find work in the Chicago metropolitan region as an assembler, sorter, or hand packer. (R. 125-29.) The VE also explained, however, that none of those positions would be available if— as Dr. Ezeokoli opined—Plaintiff would need unscheduled half-hour breaks every three to four hours, or if the person were absent three days per month. (R. 128.)

7

**Disability Determination Process**

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations prescribe a five-part sequential test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520.

Under the regulations, the Commissioner must consider the following: (1) whether the claimant has performed any substantial gainful activity during the period for which she claims disability; (2) if she has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe and of such duration as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the residual functional capacity ("RFC") to perform her past relevant work; and (5) if the claimant cannot perform her past relevant work, whether she is unable to perform any other work existing in significant numbers in the national economy. *Id.*; *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001). An affirmative answer at steps one, two or four leads to the next step. *Zurawski*, 245 F.3d at 886. An affirmative answer at steps three or five requires a finding of disability, whereas a negative answer at any step other than step three precludes a finding of disability. *Id*. The claimant bears the burden of proof at steps one to four, and if that burden is met, at step five the burden shifts to the Commissioner to provide evidence that other work exists in significant numbers in the national economy that the claimant is able to do. 20 C.F.R. § 404.1560(c)(2); *Zurawski*, 245 F.3d at 886.

**The ALJ's Decision**

The ALJ determined that Plaintiff is not disabled. At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since April 14, 2009, and at step two, the ALJ concluded that Plaintiff had two severe impairments: diabetes and depression. (R. 14.)

At step three, however, the ALJ found that none of Plaintiff's impairments met or equaled the severity of any disability listing. (R. 15.) At steps four and five, the ALJ determined that Plaintiff was unable to perform any of her past work as a sales clerk, cashier, or dietary aide, but would be able to perform the job requirements of a hand packer, assembler, or sorter. (R. 25-26.) In reaching that conclusion, the ALJ determined that Plaintiff can lift up to 20 pounds occasionally and ten pounds frequently; stand, walk, or sit approximately four hours per eight-hour workday, with normal breaks and an option to sit or stand alternatively at will provided she is not off task more than 10% of the work period; and work in a "low-stress job" limited to "simple, routine, and repetitive tasks." (R. 17.)

The ALJ also weighed the import of the medical opinion evidence. He gave no weight to Dr. Hudspeth's report because the opinion it relied on, from Dr. Rana, could not be obtained. (R. 12.) The ALJ also did not give "significant weight" to the opinions of Dr. Kenney and Dr. Mack from 2009 because the more recent assessments supported "additional limitations." (R. 23.) Opinions of non-examining doctors were afforded less weight than the examining doctors, Dr. Biale, Dr. Fine, and Dr. Ezeokoli. (*Id.*)

The ALJ concluded, however, that Dr. Ezeokoli's determination that Plaintiff would be absent three days per month and would need unscheduled breaks every three to four hours was speculative and unsupported by objective evidence. (R. 24.) The ALJ emphasized that

9

"Dr. Ezeokoli's own treatment notes reflect essentially normal physical examinations with few objective findings to support the severity of limitations listed in this opinion." (*Id*.) But "in giving the claimant every benefit of the doubt, and in giving weight to his status as a treating source," the ALJ "incorporated many of the limitations listed in Dr. Ezeokoli's opinion into the residual functional capacity." (*Id.*)[5]

### STANDARD OF REVIEW

The Social Security Act provides for limited judicial review of a final decision of the Commissioner. *See* 42 U.S.C. § 405(g). Where the Appeals Council declines a requested review of an ALJ's decision, it constitutes the Commissioner's final decision. *Villano*, 556 F.3d at 561-62. While an ALJ's legal conclusions are reviewed *de novo*, the ALJ's factual determinations are reviewed deferentially and are affirmed if they are supported by substantial evidence in the record. *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010); *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Evidence is substantial if it is sufficient for a reasonable person to accept it as adequate to support the decision. *Jones*, 623 F.3d at 1160; *Craft*, 539 F.3d at 673. "Although this standard is generous, it is not entirely uncritical," and the case must be remanded if the decision lacks evidentiary support. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When evaluating a disability claim, the ALJ must consider all relevant evidence and may not select and discuss only the evidence that favors her ultimate conclusion. *See Murphy v. Astrue*, 496

---

[5] In response to Plaintiff's first appeal, the Board directed the ALJ to consider two assessments not discussed in the first order. (R. 159.) On remand, the ALJ explained that those assessments relate to a different claimant, not Plaintiff, and were provided by Plaintiff's attorney merely as examples of consultative examination reports. (R. 11.)

F.3d 630, 634-35 (7th Cir. 2007); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Although the ALJ is not required to discuss every piece of evidence, the ALJ must provide an accurate and logical bridge between the evidence and the conclusion, so that a reviewing court may assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review. *Craft*, 539 F.3d at 673. "If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded." *Villano*, 556 F.3d at 562.

## DISCUSSION

Plaintiff takes issue with four aspects of the ALJ's decision. According to Plaintiff, the ALJ erred by (1) improperly analyzing whether she met or equaled a listing, (2) wrongly concluding that she lacked evidence to support her credibility, (3) discounting Dr. Ezeokoli and thereby incorrectly assessing her RFC, and (4) not requesting further information from consultive examiners Dr. Fine and Dr. Biale.

**1.    Disability Listings at Step 3**

Plaintiff argues that the ALJ did not "consider properly" whether she met or equaled listings 3.02(C)(2) (chronic pulmonary insufficiency resulting in chronic impairment of gas exchange) and 12.04 (affective disorder). (Pl.'s Mem. at 6-7.)

Plaintiff contends that she met listing 3.02(C)(2), which describes chronic pulmonary insufficiency due to clinically documented pulmonary disease. 20 C.F.R. Part 404, Subpt P. App. 1, § 3.02(C). Plaintiff argues that she met that listing level because she had blood-gas exchange readings of the required severity on one day in 2009. (Pl.'s Mem. at 7, citing R. 581.) As the ALJ

11

explained, that listing requires two or more such readings under certain conditions. (R. 15.) Plaintiff now argues that the ALJ failed to consider Plaintiff's other limitations together with the single reading to see if she met that listing. (Pl.'s Mem. at 6-7.) Plaintiff points to evidence, for example, that she has a wide-based gait and a reduced range of motion in her left shoulder, and that a consultative examiner diagnosed Plaintiff as having diabetic neuropathy. (*Id.* at 7.) Plaintiff does not, however, explain how those limitations, if considered with the single blood-gas exchange reading, would demonstrate a chronic impairment due to documented pulmonary disease that medically equals the severity required for the listing in 3.02(C)(2).

Plaintiff also contends that the ALJ erred by not ordering an additional consultative examination because Plaintiff's blood-gas levels tested within the required levels once in 2009. (Pl.'s Mem. at 8.) An ALJ may order a consultative examination if the evidence is insufficient, but the ALJ generally is "not required to order a consultative examination in order to adequately develop the record." *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007); *Hawkins v. Chater*, 113 F.3d 1162, 1168 (10th Cir. 1997) (refusing to impose a duty on the ALJ to order consultative examination when claimant is represented and the need for one is not clearly established). As the Commissioner notes, the listing requires two or more elevated blood-gas readings "within a 6-month period," so ordering additional testing years after the first occurrence would not have helped Plaintiff's allegation of disability. (Def.'s Mem. at 5.) Here, where Plaintiff's blood-gas readings met the listing levels on just a single occasion in 2009, and there was no other evidence of chronic pulmonary disease, the ALJ justifiably determined that Plaintiff did not meet listing 3.02(C)(2).

The ALJ also rejected Plaintiff's argument that she met listing 12.04 for "affective disorders," under which a person must meet the requirements in either Paragraph B or C of the

listing. 20 C.F.R. Part 404, Subpt P. App. 1, § 12.04. Paragraph B requires the person to have two of the following conditions: (1) marked restriction on daily living; (2) marked difficulties maintaining social functioning; (3) marked difficulties maintaining concentration, persistence, or pace; or (4) repeated, extended episodes of decompensation. (*Id*.) Paragraph C requires a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration," along with repeated, extended episodes of decompensation, a residual disease process resulting in marginal adjustment, or a history of at least one year of being unable "to function outside a highly supportive living arrangement." (*Id*.)

The ALJ reviewed in detail the evidence regarding Plaintiff's mental health record and the reports of consultative examinations, which found some "mild" and "moderate" restrictions but not "marked" restrictions. (R. 15-16.) He referred to and cited evaluations that Plaintiff contends he ignored. For example, the ALJ considered both the psychiatric review by Dr. Joseph Cools (R. 707-720) and Dr. Henry Fine (R. 748-52), and gave "weight" to Dr. Fine's opinion (R. 16). The ALJ noted, as the consulting doctors did, that Plaintiff has never had any inpatient or outpatient mental health treatment or medication. (R. 15.) Plaintiff's complaints to her primary care physician caused him to refer her to the psychiatric clinic, but Plaintiff did not pursue that. (*Id*.) Moreover, the ALJ observed that the reports by the consultants were based "largely on [Plaintiff's] subjective complaints, without any support from underlying treatment records." (R. 16.) The ALJ concluded that Plaintiff experienced only one or two episodes of decompensation, a conclusion supported by substantial evidence, including Dr. Cool's finding. (R. 717.)

The ALJ's conclusion that Plaintiff's impairments do not meet a listing level of severity is supported by substantial evidence. Reversal of the ALJ's Step 3 analysis is not warranted.

13

## 2. Plaintiff's Credibility

Plaintiff also argues that the ALJ erroneously decided that her failure to seek medical treatment and a purported lack of objective evidence to support her testimony undermined her credibility. (Pl.'s Mem. at 9-10.) "The ALJ's credibility determinations are entitled to special deference because the ALJ has the opportunity to observe the claimant testifying." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). The court will "reverse credibility determinations only if they are patently wrong." *Id.* To show that the determination was patently wrong, Plaintiff "must do more than point to a different conclusion that the ALJ could have reached." *Id.* at 1162.

Plaintiff first argues that the ALJ should have inquired whether she did not seek further medical treatment because she could not afford it or because the medication was ineffective or caused side effects. (Pl.'s Mem. at 9-10.) Plaintiff notes that the Seventh Circuit has faulted ALJs for discrediting claimants who did not complete treatment when there was evidence that the claimant could not afford it. *See Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011); *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013). As the Commissioner explains, however, there is no evidence here that the Plaintiff could not afford to follow through with her doctor's instructions. (Def.'s Mem. at 9.) Although Plaintiff said that she did not do much outside the house because she lacked money (R. 115), she never said that she could not afford to take her medication, perform her blood-sugar testing, or attend her scheduled appointments with specialists (R. 19). At her first hearing, Plaintiff testified that she had been referred to a diabetes specialist two weeks earlier and had an appointment for November 24, 2010. (R. 62.) She did not say that she would be unable to go for any reason. There is no indication in the record, however, that Plaintiff went to that appointment. At the next hearing, 18 months later, she again said that she was referred to an eye doctor and a diabetes

14

specialist. (R. 110, 117-18.) Her own primary physician, Dr. Ezeokoli, expressed frustration with Plaintiff's failure to keep her appointments. (R. 692.) Likewise, there is no evidence that Plaintiff avoided her medication because of ineffectiveness or side effects.

It was not improper for the ALJ to discount the credibility of Plaintiff's complaints because of her failure to follow up with specialists to whom she was referred and her failure to follow her doctor's directions. Without an alternative explanation for Plaintiff's failure to comply with medical advice, the ALJ did not err in concluding that her lack of follow through undermined her allegations of disability. *See Castile v. Astrue*, 617 F.3d 923, 930 (7th Cir. 2010) (upholding an ALJ's decision finding "it particularly instructive that [claimant] either refused or utterly failed to adhere to the treatment programs prescribed by her physicians"); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (holding that claimant's "repeated failure . . . to seek medical treatment provides support for the ALJ's credibility finding").

Plaintiff's argument that the ALJ wrongly discredited her because of a lack of objective evidence of her conditions is similarly unpersuasive. An ALJ may reasonably conclude that a claimant is exaggerating her limitations if there is "a discrepancy between the degree of pain claimed by the applicant and that suggested by medical records." *Sienkiewicz,*, 409 F.3d at 804; *see Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). Here, as the ALJ noted, the record includes no documentation of treatment for Plaintiff's allegedly disabling depression. (R. 20.) Additionally, the consultative examiner, Dr. Fine, observed that Plaintiff exhibited appropriate mood, speech, and behavior, even though Plaintiff's subjective assessment of her condition suggested major depression. (R. 749-52.) Moreover, Plaintiff's complaints of disabling physical pain were undercut by her noncompliance with Dr. Ezeokoli's prescribed treatment, as well as Dr. Biale's observations that she

had full range of motion in all joints except her left shoulder (of which an x-ray revealed no abnormalities) and that she had "no difficulty" getting on and off the exam table or a chair. (R. 754-59.) Based on this evidence, the court is not convinced that the ALJ was patently wrong in concluding that the medical record does not support Plaintiff's testimony about her pain.

Finally, as the Commissioner notes, the ALJ relied on more factors than noncompliance with treatment and the lack of objective evidence of Plaintiff's disability to discredit Plaintiff's account of her limitations. The ALJ gave a detailed explanation for his credibility determination. (R. 19-20.) One of the factors cited by the ALJ was the Plaintiff's admission that she was let go from work not because of her health but because her employer did not approve of her taking time off to spend time with her grandchildren. (R. 19, 53.) Additionally, the ALJ noted that, contrary to Plaintiff's description of the severity of her symptoms, the treatment prescribed for her diabetes had been conservative and routine. (R. 24-25.) The ALJ discussed many of the findings in the consulting doctors' examinations, quoting Dr. Cool's conclusions that Plaintiff alleged more limitations than are supported by the medical data and that the severity of her mental illness is questionable. (R. 24.) The ALJ adequately explained his reasons for discrediting Plaintiff's testimony, and substantial evidence supports that decision.

3. **Plaintiff's RFC and Dr. Ezeokoli's Responses to the Questionnaire**

Plaintiff next argues that the ALJ failed to give adequate reasons for discounting two entries Dr. Ezeokoli made on the Diabetes Mellitus Residual Functional Capacity Questionnaire, which he completed on March 15, 2010. (Pl.'s Mem. at 10-12, citing R. 764-767 (also at R. 639-642).) Acknowledging Dr. Ezeokoli's status as treating physician, the ALJ credited some of Dr. Ezeokoli's

conclusions, including limiting Plaintiff to four hours of standing and walking in an eight-hour work day and allowing her the option to sit or stand as needed. (R. 17.) The ALJ nonetheless rejected Dr. Ezeokoli's notation that Plaintiff would miss three days per month and would need unscheduled breaks every three to four hours as speculative and unsupported by the evidence. (R. 24, referring to R. 640, 642.)

"A treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations omitted). The ALJ must give "good reasons" to discount a treating physician's opinion. *See Bates v. Colvin*, 736 F.3d 1093, 1101 (7th Cir. 2013); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). One acceptable reason to reject a treating physician's opinion is the reason the ALJ provided here: that the opinion is inconsistent with substantial evidence in the record. *See Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415-16 (7th Cir. 2008). The ALJ also may consider the length of the treating relationship and the frequency of visits. *See* 20 C.F.R. § 404.1527(c)(2)(i); *Bates*, 736 F.3d at 1101.

The ALJ observed that Plaintiff had seen Dr. Ezeokoli "only infrequently," that his "own treatment notes reflect essentially normal physical examinations with few objective findings to support the severity of limitations listed in this opinion." (R. 24.) The ALJ also observed that Dr. Ezeokoli's treatment notes show that many of Plaintiff's problems "are due to her poor compliance with medication and treatment recommendations." (*Id.*) The record, cited by the ALJ, supports that conclusion. In fact, just two weeks after Dr. Ezeokoli completed the RFC questionnaire, his treatment notes for Plaintiff's follow up appointment visit state that Plaintiff missed her appointment

17

with the Stroger Hospital diabetes clinic and does not take insulin as prescribed or test herself as prescribed. (R. 596, cited by ALJ at R. 19.) In August, 2010, six months after filling out the questionnaire, the doctor wrote in Plaintiff's treatment notes that Plaintiff had become erratic in her insulin use, had missed her scheduled appointments with "podiatry and psych," and that Dr. Ezeokoli would refer her to the diabetes specialist again for the fifth time but he could not help her if she did not comply with her medication. (R. 692.)

Plaintiff does not dispute that an ALJ may discount a treating physician's opinion if it is inconsistent with the record. Instead, she argues that the ALJ ignored "a whole line of evidence" by not discussing one part of Dr. Ezeokoli's opinion: the doctor's remark that the side effects of insulin may have implications for Plaintiff's ability to work. (Pl.'s Mem. at 10-12; Pl.'s Reply at 6-8.) Plaintiff is correct that the ALJ did not specifically mention Dr. Ezeokoli's remark about side effects. Dr. Ezeokoli was not asked, however, whether Plaintiff was experiencing limitations as a result of side effects from insulin. The question was whether any medication "may have implications for working." (R. 639.) In fact, it appears that Dr. Ezeokoli wrote that insulin "might" cause the described effects, not that Plaintiff was currently experiencing them. (*Id.*) Moreover, Dr. Ezeokoli never documented problems with side effects from insulin in his treatment notes. As the Commissioner emphasizes, according to Dr. Ezeokoli's notes, Plaintiff did not take her insulin as prescribed and "the only side effect that Plaintiff reported was diarrhea due to taking metformin." (Def.'s Mem. at 12.) No other medical opinion—including those of examining physicians Dr. Fine and Dr. Biale—describes limitations resulting from insulin's side effects.

Significantly, Plaintiff fails to point to any medical evidence that supports Dr. Ezeokoli's notation that Plaintiff's medical conditions would cause her to miss three days of work per month

18

or need unscheduled breaks. (R. 24.) For these reasons, substantial evidence in the record supports the ALJ's decision to give some, but not controlling, weight to Dr. Ezeokoli's opinion.[6]

4.      **Consultive Examiners**

Finally, Plaintiff contends that the ALJ abused his discretion by not obtaining medical source statements from the consultative examiners, Dr. Fine and Dr. Biale, or calling those examiners to testify, because their observations allegedly support more limitations than those the non-examining doctors described. (Pl.'s Mem. at 13.) Plaintiff emphasizes that the agency's Program Operations Manual System ("POMS") instructs that consultative examiners should provide statements addressing a claimant's functional abilities. POMS DI 22510.015(B)(2)(a), *available* at https://secure.ssa.gov/poms.nsf/lnx/0422510015#b.[7] As the Commissioner notes, however, an ALJ does not commit reversible error by failing to comply with POMS instructions because the manual "has no legal force, and it does not bind the SSA." *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981); *Parker for Lamon v. Sullivan*, 891 F.2d 185, 190 (7th Cir. 1989) (noting that "[t]he POMS manual

---

[6] In her reply, Plaintiff argues that Dr. Ezeokoli's remark about side effects becomes more important when one considers that the ALJ found that she would be off task ten percent of the work period, and the VE "testified that being off task 15 percent would preclude work." (Pl.'s Reply at 10.) Plaintiff's statements require two clarifications. First, the VE actually said that a person would be precluded from work if off task "between 15 and 25 percent of the time." (R. 129-30.) Second, although Plaintiff links this discussion to Dr. Ezeokoli's opinion, the doctor never opined about the percentage of time Plaintiff would be off task; rather, he asserted that Plaintiff would need 30-minute breaks every three to four hours. (R. 639.) If that equates to two 30-minute breaks per work day, Plaintiff would be off task only 12.5 percent of the day (60 minutes / 480 minutes). In any event, as the ALJ discussed, Dr. Ezeokoli did not explain why Plaintiff would need these breaks, and his treatment notes do not appear to support restrictions that severe, so the ALJ's refusal to give the doctor's opinion controlling weight was substantially justified.

[7] The Program Systems Manual is a handbook for internal use by employees of the Social Security Administration. *Schweiker v. Hansen,* 450 U.S 785, 789 (1981).

has no legal force"). Moreover, the Seventh Circuit recently rejected the argument that an ALJ errs by declining to order a medical source statement from a consultative examiner, explaining that "the completeness of an administrative record is generally committed to the ALJ's discretion." *See Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) (refusing to impose a requirement that the ALJ order a medical source statement). While acknowledging that the Seventh Circuit's decision in *Thomas* rejected the argument that the ALJ should have ordered a medical source statement, Plaintiff also argues that the ALJ should have called the consulting examiners to testify because it would have been helpful. (Pl.'s Reply at 11.) As the Seventh Circuit said, the ALJ's obligation to develop a full and fair record "is not limitless." *Thomas*, 745 F. 3d at 807. The ALJ considered the opinions that the consulting examiners submitted. That is sufficient in this case.

## CONCLUSION

For the foregoing reasons, the ALJ's decision denying benefits was supported by substantial evidence. Accordingly, Plaintiff's motion for summary judgment [dkt 14] is denied, and the Commissioner's cross-motion for summary judgment is granted [dkt 19]. Judgment is entered for the Commissioner and against Plaintiff. This is a final judgment.

_____
Geraldine Soat Brown
United States Magistrate Judge

Date: May 21, 2015